## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN AND WESTERN DISTRICTS OF ARKANSAS
## LITTLE ROCK AND HOT SPRINGS DIVISIONS

IN RE:  MICHAEL ALLEN PORTER, Debtor                    4:05-bk-40321 E
                                                                            CHAPTER 7

HOLLY SELLS                                                                PLAINTIFF

V.                              AP NO.:  4:06-ap-1099

MIKE PORTER                                                                DEFENDANT

and

IN RE: JOHN F. HUFFER, JR., Debtor                         6:05-bk-90168 M
                                                                            CHAPTER 7

HOLLY SELLS                                                                PLAINTIFF

V.                              AP NO.:  6:06-ap-7058

JOHN F. HUFFER, JR.                                                    DEFENDANT


### MEMORANDUM OPINION AND ORDER GRANTING
### PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Holly Sells, filed separate Complaints under 11 U.S.C. § 523(a)(6) against

Defendants  John F. Huffer, Jr. and Mike Porter (the "**Defendants**") on March 6, 2006.  The

Defendants each filed an Answer to the Plaintiff's Complaints, and Plaintiff filed Motions

for Summary Judgment in each case.  The following exhibits were attached to Plaintiff's

Motions for Summary Judgment, all of which relate to a civil lawsuit filed by Plaintiff

against Defendants in United States District Court (case number 04-6156):

(1) Docket Report (**Exhibit "1"**);

EOD 2/28/07 by rj

(2) Plaintiff's Complaint (**Exhibit "2"**);

(3) Defendants' Answer (**Exhibit "3"**);

(4) Plaintiff's Amended Complaint (**Exhibit "4"**);

(5) Defendants' Answers to Amended Complaint (**Exhibit "5"**);

(6) Jury Instructions (**Exhibit "6"**);

(7) Jury Interrogatories (**Exhibit "7"**);

(8) District Court's Memorandum Opinion (**Exhibit "8"**);

(9) Judgment (**Exhibit "9"**);

(10) Memorandum and Order (**Exhibit 10"**);

(11) Defendants' Notice of Appeal (**Exhibit "11"**);

(12) U.S. Court of Appeals, Eighth Circuit, Order Dismissing Defendants' Appeal (**Exhibit "12"**); and

(13) Trial Transcript of Testimony (**Exhibit "13"**).

The Defendants filed Responses to the Motions for Summary Judgment, and the Plaintiff filed Replies to those Responses. Defendant Porter adopted Plaintiff's exhibits for purposes of his response. Defendant Huffer did not expressly adopt Plaintiff's exhibits, but made argument based on such exhibits and also offered an additional exhibit, a memo from Defendant Porter to Defendant Huffer and Plaintiff, labeled as **Exhibit "A"**.

On July 27, 2006, the Court ordered the two adversary proceedings consolidated. No request was made for a hearing in this matter,[1] and upon submission of the last responsive

---

[1]*See generally Clark Equip. Credit Corp. v. Martin Lumber Co.*, 731 F.2d 579, 581 (8th Cir. 1984) ("Fed. R. Civ. P. 56 does not require a hearing in the absence of a prior request.").

2

pleading, the Court took the matter under advisement.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

**UNDISPUTED FACTS**

The Plaintiff brought claims for sexual harassment, constructive discharge, and retaliation under both Title VII and the Arkansas Civil Rights Act against Mr. Speedy Car Care Center (a business owned by Defendants), Por John Enterprises, LLC (a limited liability company allegedly doing business as Mr. Speedy Car Care Center of which Defendants Mike Porter and John Huffer were owners and members)[2], and Defendants Mike Porter and John Huffer, individually, in United States District Court (case number 04-6156) (the "**District Court Action**").  A jury trial was held September 7 through September 9, 2005, before District Judge Robert T. Dawson.  The jury returned a verdict in favor of Plaintiff.

### *District Court Testimony*

In the District Court Action, Plaintiff testified that Huffer constantly asked her out. (Plaintiff's Exhibit "13",  Trial Testimony, ("Tr."), p. 117-118).  Huffer admitted this, testifying that he could not recall the number of times he did so.  (Tr., p. 329-330).  Huffer also admitted that he frequently called Plaintiff's cell phone and left messages for her.  (Tr., p. 330).  Plaintiff testified that in such messages and calls, Huffer said that he missed her; that he wanted her to come over and cuddle with him; that he wanted her to go out with him;

---

[2]In a Memorandum and Order dated November 2, 2005, the District Court stated that Defendant Porter testified that Por John Enterprises, LLC was authorized to do business as Mr. Speedy Car Care Center when it was not.

3

etc. (Tr., p. 127.)  According to Plaintiff, he asked her for sex numerous times and offered

to buy her such things as a car and a house in return, and she declined.  (Tr., p. 118-122).

Plaintiff testified that Huffer grabbed her breasts, her buttocks and in between her legs (in

private areas) on numerous occasions, and that she pushed him away each time. (Tr., p. 118).

She testified that on one occasion, Huffer followed her into a supply closet, where she was

bent over, retrieving supplies.  He closed the door and pulled her from behind to his groin

area and kissed her neck.  Plaintiff pushed him away and ran to the bathroom, crying.  (Tr.,

p. 120-121).   Tina Beckwith, a current employee of Defendants and a defense witness,

testified that she saw Huffer go into the supply closet with Plaintiff.  (Tr., p. 407).  Plaintiff

testified that much of Huffer's advances were made during after-hours on Wednesdays when

she stayed to clean the premises.  Specifically, Plaintiff testified as follows:

> **Q**   You mentioned that a lot of this took place after hours on Wednesdays
> when you did your cleaning job?
>
> **A**   Yes.
>
> **Q**   Okay.  Had you been doing this cleaning job for extra money before Mr.
> Huffer and Mr. Porter came on board?
>
> **A**   Yes, I've done it, I pretty much done it the whole time I worked at Mr.
> Speedy.  Nobody ever stayed with me before. The previous owner never
> stayed with me.
>
> **Q**   Okay.
>
> **A**   Nobody did until they took over, and John immediately started staying
> every night with a different excuse of something to do that he needed to do like
> time cards or whatever.
>
> **Q**   Now, I understand the pay period back when you worked there ended on
> Wednesdays, is that right?

4

**A**   Yes.  And I turned in the time cards usually on Wednesday night to Mr. Huffer.

**Q**   All right.  Now, at some point did you ask Jennifer Wright, who also worked at Mr. Speedy, to —

 . . .

**A**   Yes, I did that; that's correct.  I was paid $50 and I really couldn't afford to share that with anybody, but I had to have somebody to help me, because I could not stay with him by myself at night on Wednesdays, and Jennifer Wright agreed to stay and help me clean.

**Q**   Did you continue cleaning or did you stop?

**A**   I continued for a little while because I thought that would change him grabbing me, and talking to me and touching me on Wednesdays if she was there, but it continued.  She would go to a different area of the car wash.  He continued to call me in the office and grab me in every area of my body.  I kept telling him no.  It went on so much that I finally just complete -- I just quit cleaning altogether in February 2003.

(Tr., p. 118-120).

It is conceded that Defendants had no sexual harassment policy; however, when the harassment began, Plaintiff complained to her direct supervisor, Robert Jones, the general manager.  Plaintiff testified that Jones' response was that it was her fault.  (Tr., p. 127).  Jones corroborated that he told Plaintiff she should stop flirting with Huffer. (Tr., p. 356).  After the first complaint to Jones, Plaintiff testified that she continued to complain to him of the harassment and even played the recorded messages that Huffer left on her cell phone, and Jones did nothing.  (Tr., p. 126-128).  Plaintiff testified that she also told Porter about the issues, but received a similar response that she should not flirt with Huffer. (Tr., p. 130-131).  Plaintiff testified that she continued to complain to Jones, and he told her to pay more

attention to her work.  (Tr., p. 127-128).  Specifically, Plaintiff testified:

> **Q**  What did Mr. Jones do?
>
> **A**  He told me that I need to pay more attention to my job because my work was slipping.
>
> **Q**  Okay.  Was that true at some point in time, Holly; did you feel like that your work was slipping?
>
> **A**  Yes, it was.  I felt like I could not complete all of my tasks as scheduled.  It had completely -- my personality had changed.  My way of working had changed.  I never had a problem before doing my tasks with anything.
>
> **Q**  Okay.  You said your personality had changed.  How -- how -- how would -- how was your personality before this happened with Mr. Huffer?
>
> **A**  Well, I was very outgoing, very friendly.  That's the reason I was made manager.  I was a very good people person. But after that, I just couldn't even -- I was so depressed.  I was upset.  I was always sick to my stomach and even scared to go to work.  I didn't know what was going to happen to me next.

(Tr., p. 128).

On February 17, 2003, Defendants took two job responsibilities away from Plaintiff and gave them to two different employees whom Plaintiff supervised – Tina Beckwith received the scheduling function; and Lindsay Smart (now Rima) received the timecard function.  Plaintiff testified that she discovered this adverse action from Ms. Beckwith, not her supervisor nor Porter or Huffer.  (Tr., p. 128-130).  On March 28, 2003, Plaintiff and Huffer returned a customer's car from the Mr. Speedy Car Care Center.  Plaintiff testified that she was very distressed because if she cooperated in returning the car, then after the delivery of the car, she would be required to ride back to the carwash with Huffer.  (Tr., p. 132-133).  In fact, she was so distressed that Beckwith, a defense witness, testified that she

told Plaintiff, "Look, if there is a problem, all you have to do is dial your cell phone, dial Mr. Speedy's number, call 9-1-1, open a car door, and get out, call us to come get you if there is a problem." (Tr., p. 413). Plaintiff testified that because Huffer kept insisting, she agreed to return the customer's car even though she would then be required to drive back with Huffer in his car. (Tr., p. 132). On the way back, Huffer pulled into a parking lot of a grocery store and kept Plaintiff in the car with the doors locked. (Tr., p. 132). Huffer admitted at trial to holding Plaintiff for 10 to 15 minutes, and said that he just asked her why she did not tell him that she felt she was being harassed. (Tr., p. 338-340). Jennifer Wright Morse,who worked for Defendants at the time, testified that she got a call from Plaintiff's cell and heard Huffer's and Plaintiff's voices for about 15 minutes. She could not make out the words, but Plaintiff sounded like she needed help, so Morse hung up and called her boyfriend to try and find Plaintiff. (Tr., p. 94-95). Plaintiff testified that Huffer kept her in the locked car for at least 45 minutes after driving very fast to the parking lot; that he vacillated between yelling at her for telling anyone what he had done, to being nice; and that he grabbed her arm and her leg. (Tr., p. 132-133). Huffer returned Plaintiff to the car wash only after Mr. Porter called him. (Tr., p. 134).

The next day, Saturday, March 29, 2003, was Plaintiff's last day at work. That day, Mike Porter gave her a "memo." The memo was written by Porter and addressed to Huffer and Plaintiff, and stated:

> In light of recent rumors alleging some type of inappropriate contact between the two of you during business hours, I am looking for your assistance in putting this matter to rest. Based on information provided by both of you in discussions with me, it appears that if anything did happen, any fault would have to be attributed to you both. It appears that there was a mutual

7

understanding and agreement between the two of you that this was on a consensual basis.

I strongly suggest that in the future, both of you should be more cognizant of proper business etiquette, and refrain from any of these activities while at work. Your failure to adhere to this suggestion will prompt strong disciplinary action.

Your signatures on the bottom of this memo will serve as your acknowledgment and submission that anything that happened was of a consensual nature, and that nothing of this type will ever take place during normal work hours in the future. With you [sic] signatures, I will consider this matter closed, once and for all.

Huffer had already signed the memo when it was given to Plaintiff. Porter testified that when he wrote the memo, he did not know the truth with respect to Plaintiff's allegations against Huffer; he said that he only knew that Huffer had put his arm around Plaintiff and pinched Plaintiff on her bottom, and that he believed Plaintiff did not consent to those actions. (Tr., p. 240-241, 275, 293). Porter also testified that he wrote the memo to put an end to the matter. (Tr., p. 240-241). Porter left for lunch after giving Plaintiff the memo. Plaintiff was extremely upset and did not know what to do; she testified:

**Q** Okay. What did you do when you opened the desk drawer and got the memo?

**A** I was just -- I was in shock.

**Q** Did you read it?

**A** I read it and I just started crying. I couldn't believe it was happening. I could not believe that he had -- Mike Porter had wrote this out for me to sign about this, the behavior that John was doing to me that --

**Q** It says at the bottom of the first paragraph, it appears that there was a mutual understanding and agreement between the two of you that this was on a consensual basis. Did I read that correctly?

8

**A**   Yeah; that's correct.

**Q**   And then in the last paragraph it says your signatures on the bottom of this memo will serve as your acknowledgement and submission that anything that happened was of a consensual nature.

(Tr., p. 136-137).  Plaintiff testified that she made copies of the memo and also looked at her personnel file that day.  (Tr., p. 138).  At the end of the day, Porter asked Plaintiff if she had signed the memo and she told him she had not.  Plaintiff testified that Porter then told Plaintiff that if she did not sign the document, she would be terminated.  (Tr., p. 146). Plaintiff left that day without signing the document and subsequently decided that she could not sign the document because it was false. (Tr., p. 135-138; 145-147).  Defendants produced Plaintiff's personnel file in discovery and it was introduced into evidence at trial.  During the trial, Plaintiff reviewed her personnel file and testified that it contained a number of memos regarding her work performance which were not in her personnel file on her last day of work. (Tr., p. 138-140).  Plaintiff then testified that it was normal office procedure to obtain the disciplined employee's signature on such a memo, and that none of these memos bore her signature.  (Tr., p. 140-141).

Plaintiff testified that she spent the following weekend thinking about whether she should sign the memo to keep her job.  She testified that she discussed this with Jones on the following Tuesday when she called in sick.  (Tr., p. 148-149).  Specifically, she testified:

**A**   I told Rob that I had -- I was physically, mentally sick. I could not come to work right now.  I didn't know what to do about the memo.  I had thought about signing it, because I wanted to keep my job, but I didn't know what to do about it. And he said he needed to me to come back to work so bad that he could not run Mr. Speedy's without me.  He was begging me to come back, and I just kept telling him I didn't know what to do. I couldn't sign because it

was untrue. Rob knew it was untrue. They all knew it was, and he told me, he said, well, whenever you come back, you have to have a doctor's excuse. Mike Porter told me to tell you, you have to have a doctor's note before you come back to work.

**Q** Did you tell him you hadn't seen a doctor?

**A** I told him, I said, Rob, I don't have a doctor's note. I haven't been to the doctor. I am sick over this memo.

**Q** Was there a policy in Mr. Speedy's handbook, which is going to be introduced into evidence, requiring a doctor's excuse if an employee was out two days in a row?

**A** There wasn't a policy at all. We had our own policy, the managers did and the owners.

**Q** Okay. What was that policy?

**A** If we wanted to get rid of somebody, we gave them an excuse. We told them to get a doctor's excuse. That was the only policy we had, if we wanted to get rid of somebody that wasn't doing their job or that they just didn't like, we -- that was our thing. We told them to get a doctor's note and that always got rid of them really quick.

**Q** Because nobody ever got one?

**A** Yes, nobody ever got a doctor's note, ever.

### *Jury Instructions*

The essential elements of sexual harassment were included in Jury Instruction No. 11,

which read as follows:

Your verdict must be for Plaintiff on Plaintiff's claim of sexual harassment if all of the following elements have been proved by the preponderance of the evidence:

**FIRST**, Plaintiff was subjected to sexual advances, sexually graphic and lewd comments and inappropriate physical touching at the hands of John Huffer; and

10

**SECOND**, such conduct was unwelcome; and

**THIRD**, such conduct was based on Plaintiff's sex and made Plaintiff's working conditions intolerable; and

**FOURTH**, Defendants took adverse action against Plaintiff with the intent of forcing Plaintiff to quit or Plaintiff's resignation was a reasonably foreseeable result of Defendants' actions; and

**FIFTH**, Plaintiff's rejection of or failure to submit to such conduct was a motivating factor in Defendants taking adverse action against Plaintiff.

Working conditions are intolerable if a reasonable person in Plaintiff's situation would have deemed resignation the only reasonable alternative.

If any of the above elements has not been proved by the preponderance of the evidence, your verdict must be for the Defendants and you need not proceed further in considering this claim.

The elements of retaliation were included in Jury Instruction No. 13, which read:

Your verdict must be for the plaintiff and against the defendant on the plaintiff's retaliation claim if all the following elements have been proved by the preponderance of the evidence:

First, plaintiff complained to defendants that she was being harassed on the basis of sex; and

Second, defendants took adverse action against plaintiff; and

Third, plaintiff's complaint of sexual harassment was a motivating factor in defendants' actions.

If any of the above three elements has not been proved by a preponderance of the evidence, your verdict must be for the defendants.

With respect to punitive damages, Jury Instruction No. 16 read:

In addition to actual and nominal damages mentioned in the other instructions, the law permits the jury under limited circumstances to award an injured person punitive damages.

11

If you find in favor of plaintiff on her sexual harassment claim and/or her retaliation claim, then <u>you must decide whether defendants acted with malice or reckless indifference to plaintiff's right not to be sexually harassed or retaliated against</u>.

Defendants acted with malice or reckless indifference if:

*It has been proved by the preponderance of the evidence that defendants knew that the sexual harassment of plaintiff and/or constructive discharge of plaintiff was in violation of the law prohibiting sexual harassment and retaliation, or acted with reckless disregard of that law.*

If you find that defendants acted with malice or reckless disregard, then, in addition to any actual or nominal damages to which you find plaintiff is entitled on her sexual harassment and retaliation claims, you may, but are not required to, award plaintiff an additional amount as punitive damages if you find it is appropriate to punish the defendants or to deter defendants and others from like conduct in the future.  Whether to award plaintiff punitive damages, and the amount of those damages, are within your discretion.

### Jury Verdict and Judgment

In the District Court Action, the jury determined that Plaintiff was employed by Mr. Speedy Car Care Center and Defendants, but not PorJohn Enterprises, LLC (as Defendants had contended). The jury found for the Plaintiff on her claim of sexual harassment against Defendant John Huffer, and against both Defendants on her claim of retaliation.  On September 28, 2005, the District Court entered a Judgment pursuant to the jury verdict in favor of Plaintiff and against Mr. Speedy Car Care Center and Defendants awarding Plaintiff: (1)  lost wages and fringe benefits in the amount of $60,000; (2) front pay in the amount of $100,000; (3) compensatory damages in the amount of $50,000 (such as mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life, and personal humiliation); and (4) punitive damages in the amount of $150,000.  The Court further entered

12

Judgment in favor of Plaintiff for reasonable attorney's fees of $58,097.50 and costs of $4,100.05.

### *Post-Trial Matters*

Following the jury's verdict, the Defendants filed a Renewed Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial or Remittitur. The District Court denied Defendants' motion (and ruled on other post-trial motions not relevant to this Court's determination) in a Memorandum and Order dated November 3, 2005. In that Order, the court stated:

> Defendants next contend that there was insufficient evidence to submit Plaintiff's claims of sexual harassment and retaliation to the jury. There was a plethora of testimony that Huffer routinely asked Plaintiff to go out with him and that she declined each time. Plaintiff testified that Huffer left messages on her cellular phone saying that he missed her and wanted her to come to his house among other things. Plaintiff also testified that Huffer grabbed her breasts, buttocks and private areas on numerous occasions. The Court also heard evidence that Huffer confronted Plaintiff for reporting the harassment to Porter and kept her in a locked car for some period of time. Further, Porter attempted to force Plaintiff to sign a memo stating that the incidents between Huffer and herself were consensual and indicated if Plaintiff did not sign the memo she would be terminated.

> . . .

> There was sufficient testimony provided by Plaintiff and others for the jury to find Plaintiff was sexually harassed by John Huffer and retaliated against by Defendants.

Defendants initially appealed the Judgment to the Eighth Circuit Court of Appeals; however, the appeal was dismissed on December 30, 2005. Both Defendants filed for relief under the Bankruptcy Code (In re: Michael Allen Porter, 4:05-bk-40321 and In re: John F. Huffer, Jr., 6:05-bk-90168) on December 16, 2005.

13

## ANALYSIS

Plaintiff's Complaints allege that the judgment obtained against the Defendants in the United States District Court is non-dischargeable under 11 U.S.C. § 523(a)(6) as a debt for a "willful and malicious injury by the debtor to another entity."  Plaintiff's Motions for Summary Judgment allege that the doctrine of collateral estoppel applies in bankruptcy court, and that the jury's finding that the Defendants were liable for compensatory and punitive damages for Defendant Huffer's sexual harassment of Plaintiff, and both Defendants' retaliation against Plaintiff precludes the Defendants from relitigating the issue of whether the Defendants inflicted a "willful and malicious injury" upon the Plaintiff under § 523(a)(6) in bankruptcy court, and that therefore, Plaintiff is entitled to summary judgment as a matter of law.  Defendant Huffer responds that summary judgment is inappropriate because there was no evidence of Huffer's intent to injure Plaintiff in the district court action.  Defendant Porter responds that while the District Court judgment may establish maliciousness, it did not establish willfulness, and that there was no evidence Plaintiff was actually injured. Further, Porter argues that he should not be held vicariously liable for the sexual harassment committed by Huffer.

### A.    *Legal Standard for Summary Judgment.*

Rule 56 of the Federal Rules of Civil Procedure, as applied to these proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted where the pleadings, depositions, answers to interrogatories, admissions or affidavits show that there is no genuine issue of material fact and the moving party is entitled

14

to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Burnette v. Dow Chemical Company*, 849 F.2d 1269, 1273 (10th Cir. 1988). "In determining whether a genuine question of material fact exists, this court is required to view the facts in [the] light most favorable to the nonmoving party . . . ." *In re Glider*, 225 B.R. 439, 448 (Bankr. E.D. Mo. 1998) (citation omitted). Summary judgment is appropriate when a court can conclude that no reasonable juror could find for the nonmoving party on the basis of the evidence presented in the motion and response. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

### B.    Collateral Estoppel.

In *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 658 n. 11 (1991), the Supreme Court held that the doctrine of collateral estoppel may properly be applied in dischargeability proceedings under § 523 of the Bankruptcy Code. By applying collateral estoppel to determinations that a person has committed sexual harassment or sexual battery, several bankruptcy courts have found that debts arising from such acts are nondischargeable in bankruptcy without making further factual findings. *See e.g., Neil K. Johnson v. Alberto Obed Miera (In re Miera)*, 926 F.2d 741 (8th Cir. 1991) (Eighth Circuit held that bankruptcy court appropriately gave collateral estoppel effect to state court judgment in a sexual battery action where judgment and trial evidence established that "willful and malicious injury" issues were actually litigated in the state court proceedings.); *In re Jones*, 300 B.R. 133 (B.A.P. 1st Cir. 2003) (Bankruptcy Appellate Panel concluded "that a finding of sexual harassment constitutes the requisite injury and is equivalent to a finding of malicious and

15

willful injury for dischargeability purposes under § 523(a)(6)."); *In re Kelly*, 238 B.R. 156 (Bankr. E.D. Mo. 1999) (Bankruptcy court granted creditor's motion for summary judgment finding that the elements of collateral estoppel were met such that state court's ruling that the debtor had committed sexual battery and sexual harassment fell within the discharge exception for willful and malicious injury.); *Biggers v. Wilson*, 216 B.R. 258 (Bankr. E.D. Wis. 1997) (Bankruptcy court gave preclusive effect to state agency action's determination that debtor had sexually harassed former employee and therefore held that debtor could not dispute the willful and malicious nature of his actions.).

For collateral estoppel to apply, the following four elements must be proven by the party asserting collateral estoppel:

> (1) the issue sought to be precluded must be the same as that involved in the prior action;

> (2) the issue must have been litigated in the prior action;

> (3) the issue must have been determined by a valid and final judgment; and

> (4) the determination must have been essential to the prior judgment.

*In re Miera*, 926 F.2d at 743 (citing *Lovell v. Mixon*, 719 F.2d 1373, 1376 (8th Cir. 1983)). "Collateral estoppel may only be applied if the party against whom the earlier decision is being asserted had a 'full and fair' opportunity to litigate the issue in the prior adjudication." *Id.* "To determine whether an issue was actually litigated and was necessary to the decision in the prior action, the court should examine the entire record of the earlier proceeding." *Id.* (citing *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir. 1981); *In re Lee*, 90 B.R. 202, 205-06 (Bankr. E.D. Va. 1988)). "'An issue may be 'actually' decided even if it is not explicitly

16

decided, for it may have constituted, logically or practically, a necessary component of the decision reached in the prior litigation.'" *M. Kellie Beaupre McDonough v. Clifford F. Smith (In re Smith)*, 270 B.R. 544, 548 (Bankr. D. Mass. 2001).

In this case, a valid and final judgment finding Defendant Huffer liable for sexual harassment and finding Defendants Huffer and Porter liable for retaliation was entered following a nearly three day trial, in which Defendants had a full and fair opportunity to be heard. Accordingly, to award summary judgment in favor of Plaintiff, this Court must determine, based on the record as a whole, whether the issue in this case (*i.e.*, whether the Defendants acted with the intent to injure Plaintiff such that the debt owed Plaintiff arose from a "willful and malicious injury") was actually litigated and necessarily determined in District Court.

### C. Willful and Malicious Injury.

Section 523(a)(6) of the Bankruptcy Code provides an exception to a debtor's discharge for "willful and malicious injury by the debtor to another entity or to the property of another entity." The Eighth Circuit has determined that the debtor's actions must be both malicious and willful for purposes of this exception to discharge. *See In re Long*, 774 F.2d 875, 882 (8th Cir. 1985). *See also In re Scarborough*, 171 F.3d 638, 641 (8th Cir. 1999) ("Willful and malicious are two distinct requirements that . . . the party seeking to avoid the discharge of the debt, must prove by a preponderance of the evidence before the § 523(a)(6) exception to discharge applies.") (citing *Grogan v. Garner, supra,* 498 U.S. at 286-287)).

17

The Eighth Circuit defines the term "willful" as "deliberate or intentional." *Scarborough*, 171 F.3d at 643 (citing *In re Miera,* 926 F.2d at 744). *See also Hobson Mould Works, Inc. v. Madsen (In re Madsen),* 195 F.3d 988, 989 (8th Cir.1999). Malicious is defined as behavior "targeted at the creditor . . . At least in the sense that the conduct is certain or almost certain to cause . . . harm." *In re Miera,* 926 F.2d at 743-44 (quoting *In re Long,* 774 F.2d at 880-881). In *Kawaauhau v. Geiger,* the Supreme Court clarified that, ". . . debts arising from recklessly or negligently inflicted injuries do not fall within the compass of § 523(a)(6)." 523 U.S. 57, 64 (1998). Specifically, the Court stated, "[t]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. *Id.* at 61. The Eighth Circuit has held "that circumstantial evidence of the debtor's state of mind could be used to ascertain whether malice existed." *Miera*, 926 F.2d at 744 (citing *Long,* 774 F.2d at 881, which defined malice as "intentional harm.").[3]

Defendants Porter and Huffer both assert that the jury verdict, judgment, and evidentiary record in the District Court Action did not establish that Porter or Huffer acted with the intent to injure Plaintiff. Having reviewed the jury instructions and verdict, the judgment, and the record of the District Court Action, the Court finds that in finding that Huffer sexually harassed Plaintiff, and that both Defendants retaliated against Plaintiff, the jury necessarily and implicitly found that Huffer and Porter acted with the intent to injure Plaintiff, and with the knowledge that their actions were substantially certain to harm

---

[3]*See infra* n.6.

Plaintiff.

The injury in this case is the sexual harassment of Plaintiff and retaliation against her.[4]
*See e.g.*, *E.E.O.C. v. Sappington Garden Shop Co.*, 2006 WL 2382392 (E.D. Mo. 2006)
(Court held that party who was sexually harassed and terminated after complaining about the
harassment had standing to intervene in a lawsuit against her employer brought by the Equal
Employment Opportunity Commission because she alleged "**an injury in fact, *i.e.*, a
violation of Title VII**.") (emphasis added).   The District Court jury specifically found that
Plaintiff was subjected to sexual advances, sexually graphic and lewd comments and
inappropriate physical touching at the hands of John Huffer, and that such conduct was
unwelcome.   The jury further found that the Defendants took adverse action against Plaintiff
because she complained about such sexual harassment.   No benign or even reckless intent
can be attributed to such actions, particularly in light of the evidence provided in the District
Court Action.   Accordingly, the jury's verdict implicitly and necessarily found that
Defendants intended to injure Plaintiff.

---

[4]While Porter asserts that a physical injury is required to prove a willful and malicious
injury, courts routinely hold that other types of harm are sufficient.  *See e.g., In re Miera, supra,*
(employer kissing employee against his will); *In re Rosenberger,* 208 B.R. 445, 447 (Bankr.
C.D. Ill. 1997) ("However, an injury under § 523(a)(6) is not limited to bodily injury or physical
abuse.") (citing *In re Lubanski,* 186 B.R. 160, 167 (Bankr. D. Mass.1995) (eavesdropping); *In re
Caldwell,* 60 B.R. 214, 217 (Bankr. E.D. Tenn.1986) (malicious prosecution); *In re McGuffey,*
145 B.R. 582, 592 (Bankr. N.D. Ill.1992) (civil rights and fair housing); *In re Moore,* 1 B.R. 52
(Bankr. C.D. Cal. 1979) (racial discrimination)); *In re Zentz,* 157 B.R. 145, 148 (Bankr. W.D.
Mo. 1993) ("Initially, the Court observes that a finding of non-dischargeability under § 523(a)(6)
is not restricted to cases of physical injury but also embraces economic injury as well.") (citing
*Barclays American/Business Credit, Inc. v. Long (In re Long),* 774 F.2d 875 (8th Cir.1985);
*Coats State Bank v. Grey (In re Grey),* 902 F.2d 1479 (10th Cir.1990); *Ford Motor Credit Co. v.
Owens,* 807 F.2d 1556 (11th Cir.1987)).

The jury's verdict is supported by ample evidence of Huffer's intent to injure Plaintiff. During the trial, Plaintiff testified that Huffer repeatedly asked her out, grabbed her, and locked her in a car and yelled at her for making complaints about his behavior. There is no evidence in the trial record that Huffer was sincerely trying to establish a relationship with Plaintiff. Rather, the evidence was that she turned him down repeatedly, but he continued to pursue her. Because Plaintiff had to go to work, she was continually subjected to Huffer's advances which in turn caused her to suffer emotional pain, personality changes; and a loss of status at work. Further, Plaintiff testified that she frequently felt sick to her stomach and was scared to go to work. The evidence established that Plaintiff always said no when Huffer made advances toward her – she even quit working the Wednesday night cleaning shift (at a financial loss of $50 per week) to avoid him. Yet, at no point did Huffer cease his menacing and vulgar behavior towards Plaintiff – he clearly intended to intimidate her, to subject her to such harassment, and then to make sure he suffered no consequences by threatening her in a locked car and signing the memo prepared by Defendant Porter falsely indicating that they had a consensual relationship. In sum, Huffer's actions and Plaintiff's reactions bare no resemblance to those of persons who are sincerely and legitimately seeking each other's affections. Accordingly, no intent other than to harass and injure Plaintiff can be attributed to Huffer's sexual harassment of Plaintiff.[5]

---

[5]The Court is not attributing Huffer's conduct to Porter for purposes of determining whether the debt they owe Plaintiff is for a willful and malicious injury. To do so would disregard the plain language of § 523(a)(6) which excepts debts arising from "willful and malicious injury *by the debtor*." (Emphasis added). *See Caci v. Brink (In re Brink)*, 333 B.R. 560, 568 n6 (Bankr. D. Mass. 2005) ("Reliance on partnership law principles of vicarious

20

The Court further finds that the evidentiary record also reveals that Porter's retaliation against Plaintiff was done with the intent to harm Plaintiff. Porter admitted that although he did not know the truth regarding what was going on between Plaintiff and Huffer, he knew that Huffer had, at the very least, put his arm around Plaintiff and pinched her bottom, and that Plaintiff did not consent to those actions. Yet, Porter wrote a memorandum asking Plaintiff to confirm that whatever took place between herself and Huffer was consensual, in order to put an end to her complaints. Porter then told Plaintiff to sign the memo and not to return to work until she did. By asking Plaintiff to confirm something he knew was incorrect (that she and Huffer had consensually engaged in inappropriate conduct at work), Porter knew that he was forcing Plaintiff to either withdraw her sexual harassment complaints (and continue to be harassed), or lose her job. The District Court jury found that Porter's conduct constituted retaliation against Plaintiff despite Porter's protestation of not knowing what had taken place between Huffer and Plaintiff. The verdict together with the evidentiary record of the District Court Action establish that Porter's actions were undoubtedly taken with the intent to injure Plaintiff and the belief that she would in fact be harmed.

---

liability ignores the explicit plain meaning of the statute, i.e., that the misconduct must be performed 'by the debtor.'"); *In re Graham*, 191 B.R. 162, 165 (Bankr. W.D. Mo. 1995) ("'There is nothing in the language or legislative history of § 523(a)(6) to suggest that common law notions of vicarious or imputed liability are appended to the statutory exceptions to a discharge in bankruptcy. Quite the contrary, application of vicarious liability would effectively vitiate the § 523(a)(6) requirement that only debts resulting from *willful* acts committed *by the debtor* be nondischargeable.'") (quoting *Giuliano v. Albano (In re Albany)*, 143 B.R. 323 (Bankr. D. Conn. 1992) (emphasis in original).

21

Finally, the District Court judgment necessarily constitutes a finding of maliciousness.[6] In the sexual harassment context, a determination that sexual harassment has occurred has widely been held to constitute malice. It has been held that malice is inherent in a finding of liability for sexual harassment even where malice is not an element in the applicable sexual harassment statute. *In re Jones*, 300 B.R. at 140. "Because sexual harassment is both illegal and morally reprehensible, it is impossible to conceive of an actionable sexual harassment case against an individual employer where that employer's conduct could be construed as anything other than 'wrongful and without just cause or excuse.'" *Jacqueline Sanger v. David Busch (In re Busch)*, 311 B.R. 657, 668 (Bankr. N.D.N.Y. 2004) (quoting *In re Stelluti*, 94 F.3d 94, 87 (2nd Cir. 1996)). *See also In re Miera*, 926 F.2d at 744 (Eighth Circuit affirmed bankruptcy court's holding that state court judgment in sexual battery action "implicitly contained a finding of malice."); *In re Smith*, 270 B.R. 544 (Bankruptcy court held that malice is inherent in a finding of liability for sexual harassment.).

While this Court found no reported cases specifically addressing whether liability for retaliation in a sexual harassment case constitutes malice for purposes of § 523(a)(6), the Court easily concludes that retaliation against an employee for complaining about sexual

---

[6] The Court notes that once a Plaintiff has shown that the Defendant-Debtors intended to cause Plaintiff harm, it would be difficult to argue that the conduct was not malicious, since malice has been defined in the Eighth Circuit as "targeted at the creditor with the intent to cause harm." *See* Margaret Howard, *Exemptions under the 2005 Bankruptcy Amendments: a Tale of Opportunity Lost*, 79 Am. Bankr. L.J. 397, *418 ("Under Kawaauhau v. Geiger, 523 U.S. 57 (1998), however, subsection 523(a)(6) may be satisfied merely by a showing of willfulness, as that case defined the term. Little room seems left for maliciousness, in the wake of the Supreme Court's interpretation of willfulness.").

22

harassment is as deplorable as the sexual harassment itself.  Further, in finding retaliation in the sexual harassment context, the jury has necessarily determined that conduct was targeted at the victim of the sexual harassment that is certain or almost certain to cause harm.[7]

## CONCLUSION

The Court finds that the District Court judgment necessarily determined that Defendants Huffer and Porter willfully and maliciously injured Plaintiff such that the doctrine of Collateral Estoppel precludes this Court from finding otherwise.

Accordingly, it is hereby

**ORDERED** that *Plaintiff's Motions for Summary Judgment* are **GRANTED.**  A final judgment in accordance with this Memorandum and Order will be entered this date.

**IT IS SO ORDERED.**

_____
HONORABLE AUDREY R. EVANS
UNITED STATES BANKRUPTCY JUDGE

DATE:  February 28, 2007

cc:    Mr. R. Ray Fulmer, II, attorney for Plaintiff
       Mr. Frederick S. Wetzel, III, attorney for Defendant, John F. Huffer, Jr.
       Mr. James F. Dowden, attorney for Defendant, Michael A. Porter
       Mr. Richard L. Cox, Chapter 7 Trustee
       U.S. Trustee

_____

[7]Additionally, Defendant Porter's counsel concedes that the element of malice has been met based on the jury's determination that the Defendants acted with malice or reckless disregard for purposes of awarding punitive damages (Defendant Porter's *Brief in Support of Response to Motion for Summary Judgment*, pages 2-3).

23